IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

| | |
|---|---|
| IN RE:  MAGISTERIAL DISTRICT JUDGE  : <br> MARK A. BRUNO, MAGISTERIAL <br> DISTRICT 15-1-01 | No. 84 MM 2013 <br><br> Petition to Vacate the Order of the Supreme <br> Court dated February 1, 2013 |
| PETITION OF:  MARK A. BRUNO | ARGUED:  September 10, 2013 |

**CONCURRING OPINION**

**MR. CHIEF JUSTICE CASTILLE**

DECIDED:  August 28, 2014
OPINION FILED:  October 1, 2014

The Opinion of the Court, which I authored, addresses the constitutional issues raised, and is filed in support of the dispositive *per curiam* order already entered by the Court.  I write separately, unconstrained by majority authorship, to explain my own views on additional points not resolved by the Opinion.[1]

The Court today holds that we have broad authority at King's Bench to effectuate our supervisory function over judicial personnel including, if appropriate, by suspending without pay jurists charged with a felony for conduct on the bench.  We explained that the exercise of King's Bench authority is discretionary; the expectation is that the Court of Judicial Discipline (the "CJD") will address all matters subject to that court's Article V, Section 18(d)(2) authority, and that this Court's exercise of discretion will generally be reserved for extraordinary circumstances.

---

[1]    As Mr. Justice Saylor has noted, special concurrences such as this are "somewhat unusual but not without precedent."  Commonwealth v. King, 57 A.3d 607, 633 n.1 (Pa. 2012) (Saylor, J., specially concurring) (collecting cases).

In this case, Judge Bruno's trial and acquittal of federal felony charges (criminal conspiracy, mail fraud, and wire fraud) relating to service on the bench in Philadelphia Traffic Court has diminished the necessity of addressing the propriety of the Court entering its February 1, 2013, Order of suspension without pay in the first instance. The Court was not necessarily of one mind on the question; the arguments of the parties before us, as the Majority Opinion illustrates, illuminated pertinent tensions and considerations; and the event of the acquittal counseled a more modest approach.

For my part, I believe that the Order, when entered in February 2013, was appropriate, and indeed essential. Furthermore, in my view, the Judicial Conduct Board (the "Board") properly recognized that essentiality, and thus was correct to seek an interim suspension without pay. In addition, in my respectful view, the CJD's rationale in restoring Judge Bruno's salary during his suspension from the bench, a decision which obviously (and helpfully) was also intended to open a dialogue with this Court, was unpersuasive. Interim suspension orders issued by the CJD do not afford a direct opportunity for this Court to provide the sort of necessary, supreme guidance that we can in matters arising from a final decision of the CJD. See, e.g., In re Carney, 79 A.3d 490, 509-10 (Pa. 2013) (addressing whether jurist's off-bench conduct in road rage incident constituted "disrepute" in violation of Article V, Section 18(d)(1) of Pennsylvania Constitution; reversing CJD). Thus, the CJD's decision on interim suspension rejecting the Board's position left the Board without a direct review remedy.[2]

---

[2] In light of the constitutional language prohibiting an appeal from an interim suspension order of the CJD, limited review of a decision would be available only at King's Bench or via a certification procedure. See, e.g., City of Philadelphia v. International Ass'n of Firefighters, Local 22, 999 A.2d 555, 563-64 (Pa. 2010).

I write separately, therefore, to embrace the opportunity to engage in the dialogue prompted by the CJD.

## I. Exercise of Discretion to Suspend, With or Without Pay, Pending Accusations of Wrongdoing

There is no serious contest in this matter, as briefed by the parties, that the purpose of vesting in the CJD the authority to suspend, with or without pay, a jurist "against whom formal charges have been filed with the court by the [B]oard or against whom has been filed an indictment or information charging a felony" is to protect the appearance and actuality of fair tribunals in the Commonwealth. An interim suspension, by its nature, is not punitive as a result. Compare PA. CONST. art. V, § 18(d)(1) (listing disciplinary sanctions) with PA. CONST. art. V, § 18(d)(2) (authorizing interim suspension; no right to appeal suspension). The concern vindicated by the CJD's authority relating to interim suspensions is the necessity to guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth. Accord In re Franciscus, 369 A.2d 1190, 1194 (Pa. 1977); In re Assignment of Avellino, 690 A.2d 1138, 1143 (Pa. 1997) ("Avellino I"). Although premised upon different constitutional authority, the responsibility is akin to that of this Court and the considerations justifying the exercise of legal discretion by the CJD are similarly cabined by its justification. The countervailing considerations implicate due process or fairness concerns. See City of Philadelphia v. International Ass'n of Firefighters, Local 22, 999 A.2d 555, 563 (Pa. 2010) ("no adjudicatory body has unlimited discretion, and each and every adjudicator is bound by the Constitution and particularly by the mandates of due process"); accord In re Hasay, 686 A.2d 809, 815 (Pa. 1996) (disciplinary matter is civil proceeding but, in

light of severity of potential sanctions, recognize that jurist is "clothed with the fundamental constitutional rights available to criminal defendants"). Evidence critical to an interim suspension decision, and conditions of pay, is that which addresses these concerns in the context of the two distinct questions implicated: (1) is a suspension suitable and (2) is the withholding of pay warranted, pending resolution of, here, the federal felony charges against Judge Bruno relating to his service on the bench.

Where, as in Judge Bruno's case, the allegations of wrongdoing consist of felony charges related to conduct on the bench, the justification for suspension pending resolution of the felony charges is immediately obvious. Pending charges of any nature can create perverse incentives for a presiding jurist to decide cases in a manner that would curry favor with prosecuting authorities (including when the prosecuting authority is distinct from that appearing before the jurist) or with a potential jury. See In Interest of McFall, 617 A.2d 707, 712-14 (Pa. 1992) (Common Pleas Judge Mary Rose Fante Cunningham, who surreptitiously conducted surveillance for FBI pursuant to agreement that her cooperation would be made known to Philadelphia District Attorney, had "direct, personal, substantial, and pecuniary interests" in matters before her because "she faced potential prosecution by the same authorities that prosecuted defendants in her courtroom every day."). On the other hand, an accused jurist who believes the charges are baseless could be biased against governmental authorities. A jurist acting unconsciously or overtly upon these incentives undermines those values of justice that all judges are sworn to uphold.[3]

---

[3] These same incentives operate even where, unbeknownst to this Court or the Board, the defendant jurist was negotiating with prosecutors before the charges, or a plea arrangement, are announced -- as was the case with two disgraced jurists at the center of the Luzerne County juvenile justice scandal, Michael T. Conahan and Mark A. Ciavarella. As a result, a suspension immediately following announcement of the charges or of a plea is not a full remedy and may justify this Court's intervention before (continued…)

The appearance of impropriety that would arise from allowing a charged but not yet tried or convicted judge to sit in judgment of others adds a secondary indirect, but no less momentous, burden upon the judicial system by undermining the confidence of the bar and ultimately of the public. See McFall, 617 A.2d at 712 ("In order for the integrity of the [J]udiciary to be compromised, we have held that a judge's behavior is not required to rise to a level of actual prejudice, but the appearance of impropriety is sufficient."). These considerations were especially poignant when this Court entered its interim suspension order because Judge Bruno's felony indictment related to allegations that his objectivity as a jurist was compromised, and the allegations occurred in the broader context of systemic judicial corruption in the Philadelphia Traffic Court, on which he was serving by assignment of this Court. To state it bluntly, a jurist who sets about to "fix" a case, or even to interfere *ex parte* in a case in a way that could influence a decision, has no business on the bench. Improper influences are not limited to bribery or *quid pro quo* exchanges of favors or consideration. And, this is not esoteric: all judges know what is proper and what is not; and those who stray should expect and accept severe consequences.

Withholding Judge Bruno's judicial salary during his suspension was plainly warranted by the circumstances. Initially, I stress that I do not advocate withholding

---

(…continued)

the CJD is able to act. See PA. CONST. art. V, § 18(d)(2) (CJD may suspend jurist "against whom formal charges have been filed with the court by the board or against whom has been filed an indictment or information charging a felony"). The object of Rule of Judicial Administration 1921 (requiring judge to report to Chief Justice in the event s/he is subject to any federal or state investigation or prosecution) is to ameliorate this situation. Moreover, awareness of the prospect of immediate suspension without pay obviously would serve as a further disincentive to those in robes who consider criminal conduct relating to their judicial duties.

salary automatically whenever a judicial officer faces charges, or even felony charges. Here, Judge Bruno was indicted on one count of mail fraud, one count of wire fraud, and one count of conspiracy to commit wire and mail fraud. See 18 U.S.C. §§ 1341, 1343, 1349. In the abstract, these charges can derive from a variety of conduct. In Judge Bruno's case, however, the indictment was premised upon alleged conduct involving his judicial duties, *i.e.*, allegations that he "elevat[ed] his self-interest over his core judicial obligations." See Joseph v. Scranton Times L.P., 987 A.2d 633, 636 (Pa. 2009). By their oaths and governing conduct rules, judges are put on notice that more is expected of them than of other citizens. The stain of one implicates all, and all judicial officers are, or should be, aware of that fact. When this Court acted, it did so in light of Judge Bruno's alleged conduct on the bench, which was irreconcilable with the judicial oath of office.

Equally as important, the allegations against Judge Bruno could not be viewed in isolation, but only in the context of an investigation into widespread corruption within the Philadelphia Traffic Court, including *ex parte* adjusting of cases. In the aftermath of the federal investigation, this Court appointed the Honorable Gary S. Glazer of the Philadelphia County Court of Common Pleas to supervise the administration and reform of the Traffic Court, with the goal of improving operations and ensuring restoration of the integrity of adjudications of traffic offenses in Philadelphia. And, the General Assembly has commenced the process of amending the Constitution to abolish Traffic Court. See S.B. 333, 2013-2014 Gen. Assem., Reg. Sess. (2013).

Judge Bruno's necessary suspension pending resolution of the federal charges means that the citizens were not benefitting from the services of the jurist. Cf. Matter of Cunningham, 538 A.2d 473, 478 n.8 (Pa. 1988) (loss of productivity of suspended jurist "results in an intolerable burden placed upon the people of th[e] judicial district and

would further strain the resources of the entire system"); id. at 478 (in disciplinary context, "possible [sanction] should assist in ameliorating the injury caused by the dereliction" of jurist). Of course, there is a presumption of innocence, and jurists facing criminal charges have the same right to demand that the government prove its criminal case. But, the practical reality is that, in the event of a conviction, restitution to the Commonwealth of the salary paid during the suspension may be difficult or impossible. If, as it so happened in Judge Bruno's case, charges against the jurist are dismissed or the jurist is acquitted, reinstatement with back pay is always available to make the jurist whole. In my view, on balance, withholding salary in the case of felonies relating to conduct on the bench -- and thereby allocating the risk of an erroneous decision regarding pay to the accused jurist -- better vindicates the public interests in the integrity and dignity of the judicial system, while sufficiently accommodating any concerns of fairness to the jurist. Indeed, I may be "old school," but in my view, it is disappointing that a judge facing this sort of felony charges, for conduct occurring on the bench, would even pursue the relief Judge Bruno pursued here. The message to Pennsylvania jurists should be made clear, as the Board recognized in pursuing suspension without pay before the CJD: more, much more, is required of those who would judge others.

Last, I would note that this result is consistent with the administrative approach of the executive branch in the event an employee or official appointed by the Governor is "formally charged with criminal conduct related to his employment with the Commonwealth or which constitutes a felony." By executive order, the employee or appointed official is to be suspended without pay as soon as practicable after the employee or official is formally charged. See 4 Pa. Code §§ 7.171-7.173, 7.178. I suggest that, in future cases, the CJD reconsider its contrary position. In circumstances

like these, it is beyond unseemly that the CJD would afford criminally accused members of the Judiciary special treatment.

## II.    The CJD Opinion and Potential Pitfalls of CJD's Approach

On May 24, 2013, the CJD ordered the interim suspension of Judge Bruno with pay, pending further order of that court, and issued an opinion explaining the court's reasoning.[4]  The CJD held that the federal crimes with which Judge Bruno was charged related to his everyday duties as a judicial officer and, as a result, his continued presence on the bench pending resolution of the charges would have "a possible negative impact on the administration of justice and could possibly harm the public confidence in the [J]udiciary."  In re Bruno, 69 A.3d 780, 782 (Pa. Ct. Jud. Disc. 2013). (That is an understatement.)

The CJD also held that suspension with pay was appropriate.  In reaching this conclusion, the CJD undertook to assess the strength of the case against Judge Bruno and expressed its collective skepticism that the federal government would be able to meet its burden of proving criminal conspiracy, and mail or wire fraud, premised upon the facts averred in the federal charging document and its interpretation of federal criminal law precedent.  The CJD discounted and explained the allegations in the complaint, without the benefit of hearing the evidence introduced at trial.  Id. at 783-86, 789-90 (citing 18 U.S.C. § 1341; U.S. v. Cross, 128 F.3d 145 (3d Cir. 1997)).  The CJD

---

[4]    The CJD also ordered the Administrative Office of Pennsylvania Court to provide Judge Bruno backpay, from February 1, 2013 to May 24, 2013.  The Office did not comply and Bruno filed a Petition to Vacate the Order of the Pennsylvania Supreme Court dated February 1, 2013.  On July 11, 2013, the Court acted upon Bruno's petition by entertaining oral argument on the issues addressed by the Majority.  The Court also directed the AOPC to recommence paying Bruno's salary pending final resolution of the dispute, retroactive to February 1, 2013.

also opined upon the proper interpretation of federal decisional law, to conclude that the federal government had a questionable probability of success in proving that Judge Bruno engaged in the criminal conduct alleged. Id. at 794.

The CJD then noted with approval Judge Bruno's election record, long tenure as a magisterial district judge, election to leadership positions of trade associations by his peers, and his appointment by the Court to the Minor Court Rules Committee. The CJD also compared Judge Bruno's case with others that had been deemed to merit suspension, to determine whether suspension would be with or without pay.

The CJD weighed under a totality of circumstances test the nature of the charges, its estimation of the chance of success in convicting Judge Bruno in the federal proceedings, the time in which the case would come to trial, and the type of suspension imposed in similar cases. The CJD determined that the appropriate action was an interim suspension with pay. Id.

Out of deference to the concerns aired by the CJD in rejecting the position of the Board (and of this Court, as reflected in our unanimous February 1, 2013, Order) and concluding that a suspension with pay was the appropriate maximum response, I will explain why I am not persuaded by its approach. In my view, the several elements identified by the CJD as relevant to the interim suspension inquiry are incongruent with the purposes of the Article V, Section 18(d)(2) authority of the CJD to issue interim suspensions.

Initially, I agree that the nature of criminal charges leveled against a jurist are relevant to an interim suspension inquiry and to pay conditions. I also agree that if, unlike here, there was some specific reason to question the competence or the good faith of the federal prosecutor, an assessment of the merits of the criminal charges may be relevant. In other instances, however, I believe that a deconstruction of a criminal

case premised upon a charging document and one-sided advocacy is a troubling criterion which loses sight of the imperative of judicial integrity -- not only in the actuality of integrity, but in the appearance of integrity. The fact that a jury later did not find guilt beyond a reasonable doubt, as it so happened, and for whatever reason, does not change the question of the appropriate response to felony charges implicating judicial misconduct.

The CJD's analysis seemed to suggest: one, that the federal prosecuting authorities would be unable to prove the felonies charged as a matter of law and, two, that the facts averred in the complaint were insufficient to prove that Judge Bruno engaged in any criminal conduct. Starting with the second point, it is important to note that the purpose of a charging document is to state a *prima facie* case. The burden on the government to make a *prima facie* case is far lower than that which the government is required for the case to proceed to a jury (or to a judicial factfinder) to determine conviction or acquittal. As a result, the assumption that a charging document reflects the universe of evidence available for trial is wrong. More importantly, as the Pennsylvania Bar Association (the "PBA") recognizes, where the CJD does not, the deconstruction of a charging document "risks an inappropriate collateral attack on the validity of th[e criminal] charges" and potentially embarrassing conflicts with the criminal court adjudicating the charges. PBA Brief at 21.[5] In addition, even an acquittal does

---

[5] The PBA's view proved to be prescient. For example, the CJD concluded that allegations relating to the "ticket fixing" scheme failed as a matter of law to show how any victim had been defrauded of a "property right." According to the CJD's definitive assessment of federal law, the City of Philadelphia and the Commonwealth of Pennsylvania are not legally entitled to fines and costs from alleged traffic offenders. "[I]t isn't until that finding is made that those citizens have a legal obligation to pay fines and costs associated with some crime. . . . An adjudication of guilty is a prerequisite" to a finding that the City of Philadelphia and the Commonwealth of Pennsylvania "have been deprived of property or of a property right within the meaning of the mail and wire (continued…)

fraud statutes. . . ."  <u>Bruno</u>, 69 A.3d at 793.  Moreover, the CJD concluded, "[t]he Commonwealth's interest in license suspensions and revocations is ancillary to its power to regulate, and is not a property interest."  <u>Id.</u> (quoting <u>U.S. v. Schwartz</u>, 924 F.2d 410, 418 (2d Cir. 1991)).

The district court addressed this very point of federal law and rejected a similar argument in disposing of the motion to dismiss of Judge Bruno's co-defendant:

> Sullivan's argument . . . fails under the specific facts of this case because the Indictment charges Defendants with the object of the alleged fraud as being the prevention of guilty adjudications; thereby, resulting in statutorily required fees and costs not being assessed or paid to the Commonwealth and the City.  It is the fact that the specific tickets at issue did not result in guilty adjudications with fees and costs which is at the heart of the entire "ticket-fixing" scheme alleged in the Indictment.  The crux of the Government's conspiracy claim is Defendants' unique ability to prevent guilty adjudications that allows them to give preferential treatment to certain ticketholders for those with whom they were politically and socially connected.  In this case, Defendants are in the unique position of being Traffic Court judges who have the power and, according to the Indictment, used such power to not permit the adjudication of specific traffic citations as guilty with fees and costs.  Finding in favor of Defendants' argument that the Commonwealth and the City have not suffered economic harm because the right to fees and costs here is only triggered by a guilty adjudication, an assessment or deficiency being imposed, is circular in the context of this case.  To accept Defendants' argument would permit the alleged conspirators in this case to enter into a scheme to commit fraud and then hide behind the argument that the success of their fraud precludes prosecution under the "money or property interest" requirement of the mail and wire fraud statutes.

> Additionally, we point out that the Indictment alleges that Defendants conspired and schemed to prevent the payment of actual fines, not merely potential fines. Defendants argue that, "[a]t most, the City and

not mean the government failed to adduce sufficient evidence to convict, and thus, the jury's verdict in this case does not justify an approach by which the merits of charges of wrongdoing pending elsewhere are analyzed anticipatorily. And, finally, the question of whether the federal government will ultimately prove violations of federal criminal law is not coterminous with the question of whether there was misconduct on the bench. A defense of "fixing tickets is not a federal offense, even though it may be unethical, if money did not change hands" may prevail with jurors in an individual case; but an allegation of *ex parte* interference to fix a case is most certainly a basis for a response,

---

(…continued)

> Commonwealth have a potential entitlement to collect a fine that might be assessed at a future point, but such a speculative property interest by definition is not 'property in the [government's] hands.' " Regarding the Indictment before us, Defendants' argument misses the mark because the Indictment does not address traffic citations awaiting adjudication, but addresses traffic citations that have been adjudicated. Adjudicated, argues the Government, pursuant to a conspiratorial scheme designed to prevent guilty rulings resulting in the payment of fines.
>
> Defendants' argument implies that the Government has to prove that the Commonwealth and the City were actually deprived of money or property. This is not required. The relevant inquiry concerns what Defendants intended-not whether the Commonwealth and the City were actually deprived of money or property.

U.S. v. Sullivan, 2013 WL 3305217 at *7-8 (E.D. Pa. 2013) (internal citations omitted) (citing U.S. v. Tulio, 263 F. App'x. 258, 261 (3d Cir.2008)).

The outcome of the federal trial perhaps reflected that, in this unfortunately cynical age, jurors want more than what federal criminal law requires -- *i.e.*, that they want evidence of actual bribery, or money changing hands. But, that does not mean that the government had no case, nor does it mean that the prosecution was unwarranted.

including an interim suspension with or without pay, by the CJD or, if necessary, by this Court.

For better or for worse, the CJD's opinion in <u>Bruno</u> now stands as precedent for a jurist charged with corruption on the bench to seek to pre-litigate the strength of the government's criminal case, in order to subsidize his criminal defense. I agree with the Board that more should be expected of Pennsylvania jurists (just as more is expected of executive employees); and I hope that the Board continues to pursue its righteous cause and that the CJD will one day come to embrace that view.