**[J-95-2016] [MO: Wecht, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| CITY OF PHILADELPHIA, | : | No. 26 EAP 2015 |
| | : | |
| Appellee | : | Appeal from the Order of |
| | : | Commonwealth Court entered on |
| | : | 12/11/2014 at No. 1347 C.D. 2013, |
| v. | : | affirming the Order dated 7/9/2013 of |
| | : | the Court of Common Pleas, |
| | : | Philadelphia County, Civil Division at |
| NATHAN LERNER, | : | No. 2693 September Term, 2009 |
| | : | |
| Appellant | : | ARGUED: March 8, 2016 |
| | : | RESUBMITTED:  August 17, 2016 |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                                        **DECIDED:  November 22, 2016**

In this case, the City of Philadelphia came into a Pennsylvania court, forthrightly admitted in its case-in-chief that its claim lacked any evidentiary basis and that the claimed amount was entirely arbitrary and a complete fiction, but nevertheless demanded that the court enter judgment in its favor (which it did).  The Majority, in robotic adherence to common rules of efficiency, and without even a mention of this Court's overarching duty to protect and maintain public confidence in the integrity of Pennsylvania's court system, implicitly blesses the City's fraudulent behavior.  Because this Court should, without exception, exercise our supervisory authority to ensure that the courts of this Commonwealth retain a steadfast fidelity to honesty and integrity, I must respectfully dissent.

The Majority's statement of the factual predicate for this case is not inaccurate, although it emphasizes and highlights points ameliorative of the City's collection tactic.[1] In the City's civil collection action, Lerner filed an answer in which he contended that the claimed amount due was specious and arose from the City's "tortuous administrative misfeasance and malfeasance." Amended Answer and New Matter and Counterclaim, 8/13/13, ¶ 7. **He was correct.** At the bench trial on June 26, 2013, the City called Denise Reynolds, the City's Revenue Collection Manager. Reynolds testified that Lerner's tax liability was $280,772.60. N.T., 6/26/2013, at 10-20. When asked to explain the basis for this assessment, Reynolds testified that when Lerner did not respond to the request for his federal tax returns, the City created a "jeopardy assessment."[2] Id. at 27. According to Reynolds, the amount of this jeopardy

---

[1] As one example, the Majority complains that "[w]ithout Lerner's tax records, the City had no idea how much Lerner's businesses earned." Majority Op. at 3. The Majority does not acknowledge, however, that the City's Department of Revenue Regulations, in accordance with powers conferred by section 8-409 of the Philadelphia Home Rule Charter, authorized the Commissioner of Revenue to examine Lerner under oath and to compel from him by subpoena all "books, papers, and records and copies of tax returns filed with other taxing authorities …." Phila. Dept. of Revenue General Regulations § 305. The certified record in this case does not reflect that the Commissioner ever exercised these powers vis-à-vis Lerner, and instead the Department of Revenue proceeded against Lerner without first obtaining evidentiary support.

[2] The term "jeopardy assessment" is found in sections 407.2 and 339 of the Pennsylvania Tax Reform Code of 1971, as amended, 72 P.S. §§ 7407.2 and 7339. The term refers to a situation where the Pennsylvania State Department of Revenue believes that an assessment or collection of a tax deficiency will be jeopardized by delay. Jeopardy assessments are not meant to "scare" a potential taxpayer into compliance. Nor are they intended to be totally fictitious with no basis either for the belief that taxes are owed or the amount thereof. Rather, jeopardy assessments are "[d]esigned for emergency situations in which the failure to act immediately could result in the government's permanent loss of tax revenue." *See* Note, *The Taxpayer's Right to Counsel in Jeopardy Assessments*, 56 Tex.L.Rev. 883 (1978). The Philadelphia Code does not authorize even legitimate jeopardy assessments.

assessment was "not based on any specific information the [C]ity had," and was instead an arbitrary figure placed in the data base "with the hopes that it will elicit a response from the taxpayer" and "make them compliant." Id. at 41.

In response to further questioning by the trial court, Reynolds offered that the jeopardy assessment was "just something you make up to scare the taxpayer into coming in." Id. at 43. The trial court elicited the following additional testimony:

> Q. TRIAL COURT: [W]hat's the basis for the scary number?
>
> A. My manager at the time would have given me a number to produce the gross receipts and net income for the business taxes.
>
> Q. TRIAL COURT: Where would he have gotten that number?
>
> A. He really just makes them up. We try to make it real high. If it's a low balance the taxpayers will say, Okay, fine, I'm going to pay this. We don't want them to do this. We want them to come in and make sure the figures are accurate. We make them high.
>
> Q. TRIAL COURT: In essence, there's no real basis of this number?
>
> A. No, there's not. Just a number.

Id. at 43-44.

Reynolds next testified that the net annual income of $150,000.00 she used to compute the taxes assessed against Lerner was just "a made up figure." Id. at 55-56. The trial court again questioned her, as follows:

> Q. TRIAL COURT: Is there a scientific basis or is it just completely, completely arbitrary?
>
> A. It's completely arbitrary - well, for discovery purposes it's completely arbitrary.

* * *

> Q.   TRIAL COURT: So the only assessment that was done in this case was based upon $150,000?
>
> A.   That's correct.
>
> Q.   TRIAL COURT: And it's based on a figure with no foundation whatsoever.
>
> A.   That's correct.

Id. at 60-61.

After the City rested, Lerner's counsel moved for a directed verdict because the City's evidence demonstrated that the assessment was just a "number picked out of the air to scare somebody." Id. at 164. The trial court agreed with counsel's statement that the City's assessment had no factual basis and was instead "basically an amount pulled out of the sky." Id. at 242-44. The trial court nevertheless concluded that because Lerner had not exhausted his administrative remedies, it was "compelled to enter judgment in favor of the [City]." Id. In its subsequent written opinion, the trial court again indicated that "even though there was no rational basis for the amount owed to [the City]," the "validity of the assessment and whether [Lerner] is liable for the delinquent taxes are no longer in issue because [Lerner] waived his right to challenge them." Trial Court Opinion, 10/22/13, at 10-11. The Commonwealth Court affirmed on the same basis, noting that while Lerner's challenges to the City's "fictional assessment" had merit and the City's "strong arm collection tactics may well lack authority in law," it could not reach the merits of Lerner's arguments. City of Philadelphia v. Nathan Lerner, 2014 WL 10298894 (Pa. Commw. Dec. 11, 2014) (unpublished memorandum).

In my view, these decisions of the courts below reflect an egregious misunderstanding of a fundamental principle that must guide our courts: to maintain public confidence, courts of this Commonwealth must retain their fidelity to honesty and integrity. It is true that a party generally must exhaust its administrative remedies before the right of judicial review arises. Feingold v. Bell of Pa., 383 A.2d 791, 793 (Pa. 1977); Pa. Indep. Oil & Gas Ass'n v. Com., Dep't of Envtl. Prot., 135 A.3d 1118, 1129 (Pa. Commw. 2015). The doctrine of exhaustion of administrative remedies is a court-made rule[3] designed to promote judicial efficiency, as it prevents premature judicial intervention into matters that may well be resolved through the administrative process. Empire Sanitary Landfill, Inc. v. Com., Dep't. of Envtl. Res. 684 A.2d 1047, 1053 (Pa. 1996). Pennsylvania courts have consistently held that the doctrine of exhaustion of administrative remedies applies to disputes relating to the assessment of taxes by the City's Department of Revenue. *See, e.g.*, City of Phila. v. Hennessey, 411 A.2d 567 (Pa. Commw. 1989); City of Philadelphia v. Santoro, 429 A.2d 113 (Pa. Commw. 1981); City of Phila. v. Kenny, 369 A.2d 1343 (Pa. Commw. 1977); City of Phila. v. Sam Bobman Department Store, 149 A.2d 518, 521 (Pa. Super. 1959); City of Phila. v. Nu-Tech Development Corp., 1988 WL 679775 (C.C.P. Phila. January 19, 1988); City of Phila. v. J. Berenato Metal Finishing Co., Inc., 1985 WL 384554 (C.C.P. Phila. April 29,

---

[3] The rule also has statutory origins, dating as far back to the Act of 1806, 46 P.S. § 156 (repealed), which stated that when a statute provides a remedy by which a right may be enforced, no other remedy than that afforded by the statute can be used. The current version of this statute, 1 Pa.C.S.A. § 1504, which is similar to its predecessor, has application here since the Philadelphia Home Rule Charter, pursuant to which the Tax Review Board was created, has the status of an act of the General Assembly. *See* Addison Case, 122 A.2d 272, 275-76 (Pa. 1956); Gans v. City of Phila., 403 A.2d 168, 170-71 (Pa. Commw. 1979).

1985). Krug v. City of Phila., 620 A.2d 46 (Pa. Commw. 1993) is another in this line of cases.

Both the trial court and the Commonwealth Court believed that the Krug line of cases compelled the entry of judgment in favor of the City. They both determined that Lerner's failure to exhaust his administrative remedies precluded him from asserting any defense to the City's claim. In so concluding, however, the courts below failed to recognize a crucial distinction between those cases and the one presently pending -- the City's admission, made during its case-in-chief, that its tax assessment was an outright scam -- a fabricated "jeopardy assessment" contrived solely to scare Lerner.[4] Because the City established that its assessment was fabricated in its case-in-chief, its admission of a scam preceded any attempt by Lerner to assert a defense.

Neither Krug nor any of the other above-cited cases presented courts with uncontroverted evidence offered by the plaintiffs, namely that the assessments at issue were fraudulent and lacked any factual basis.[5] This case, in significant contrast, presents an extraordinary circumstance -- a plaintiff in a civil collection action whose

---

[4] In its appellate brief filed with this Court, the City now contends that its assessment in this case was a permissible estimate based on the best evidence available. Brief of the City at 34-38. The City's own evidence at trial, however, demonstrated that the $150,000.00 annual net income upon which the assessment was calculated was an entirely "made-up" number intended to scare Lerner into cooperation. N.T., 6/26/2013, at 43-61. Without any basis in fact, it was not an estimate.

[5] To the contrary, in these cases the City consistently presented the trial court with a firm evidentiary basis for the amount of its claim. *See, e.g.*, Santoro, 429 A.2d at 116 (assessments of wage taxes based upon earning information received from the federal agency employing the taxpayers); Kenny, 369 A.2d at 1347 (same); Hennessey, 411 A.2d at 568 (assessment of wage and net profit taxes based upon "information supplied by Hennessey's employer"); Bobman, 149 A.2d at 521 (assessment based upon an audit of the corporation's records).

witness at trial forthrightly acknowledges that the claimed monetary award is entirely arbitrary and without any evidentiary foundation whatsoever.

The doctrine of exhaustion of administrative remedies promotes judicial efficiency, and its continued application is not in question here. But it is not sacrosanct, and as a rule of efficiency it does not, and cannot, trump the integrity of the judicial process. To hold otherwise would result in the entry of a judgment based solely upon an admitted scam, an outcome that this Court should never countenance. *Cf.* Commonwealth v. Pagan, 950 A.2d 270, 282 (Pa. 2008) ("The function of a trial is to determine the truth … .").

As the Commonwealth Court noted, the City's authority to use "strong arm collection tactics" is not presently at issue. What is at issue, however, is a plaintiff who came to a court of law in this Commonwealth to enter a judgment on a fraudulent claim. This we should not allow. No party should be permitted to invoke judicial intervention to collect on an admittedly fraudulent assessment. To maintain public confidence, the courts of this Commonwealth must retain their fidelity to honesty and integrity. *Cf.* In re Franciscus, 369 A.2d 1190, 1194 (Pa. 1977) (this Court must exercise "our supervisory authority to protect and promote the public confidence in our judicial system"). This Court does so on a regular basis, including through the regulation and discipline of judges, attorneys, and persons employed by the judiciary. *See, e.g.*, Matter of Cunningham, 538 A.2d 473, 480-81 (Pa. 1988); In re Dobson, 534 A.2d 460, 465 (Pa. 1987). We enforce the basic principle of judicial estoppel to uphold the integrity of the court system. *See, e.g.*, In re Estate of Bullotta, 838 A.2d 594, 596 (Pa. 2003); In re Adoption of S.A.J., 838 A.2d 616, 623 (Pa. 2003); Trowbridge v. Scranton Artificial Limb

Co., 747 A.2d 862, 864-65 (Pa. 2000). Judgments procured by fraud may be opened at any time and arbitration awards so tainted may be vacated. *See* Manufacturers and Traders Trust Co. v. Greenville, 108 A.3d 913, 919 (Pa. Super. 2015); 42 Pa.C.S.A. § 7341. The Pennsylvania Constitution entrusts this Court with safeguarding the integrity of the judicial system, and even the appearance of impropriety may be cause for the exercise of King's Bench jurisdiction. In re Merlo, 17 A.3d 869, 871 (Pa. 2011).

Lerner preserved the issue presented here. At trial, after the City rested its case, Lerner moved for a directed verdict on the grounds that the City's evidence established that the underlying assessment "had no basis in reality." N.T., 6/26/2013, at 164. In his subsequently filed post-trial motions and Rule 1925(b) statement, Lerner argued that the City had not introduced any evidence to support the assessment, and that it was in fact "simply made up." *See* Motion for Post-Trial Relief, 7/8/2013, ¶¶ 2-3; Lerner, 2014 WL 10298894, at *4 n.9 ("Lerner's Rule 1925(b) Statement can reasonably be read to include all the issues raised in his brief."). Finally, while Lerner referenced Krug in his presentation to the Commonwealth Court, the focus of his presentation was directed to the issue on which I would base our decision -- namely, that the City's assessment was fictitious and without any evidentiary basis.[6]

The Majority's alarmist contention that a contrary ruling would create a "Lerner Exception" reflects its profound misunderstanding of both the nature of Lerner's claim and the importance of a decision in his favor. A ruling in Lerner's favor would not

---

[6] The Majority eviscerates Lerner for his pro se litigation practices. Majority Op. at 7-8. This characterization is not entirely false, as the trial court sanctioned him for, inter alia, discovery abuses. I trust, however, that the Majority is not suggesting that Lerner fairly deserved to have a $280,772.67 sham judgment entered against him as a punishment for his intransigence during discovery.

establish any exception to the doctrines of waiver or exhaustion of administrative remedies. I do not share the Majority's pessimism or concern that litigants would misapprehend the narrowness of a contrary decision, as it would not impact the perimeters of administrative agency law or the finality of administrative agency decisions.

It is, hopefully, the rarest of occasions when a plaintiff comes into a Pennsylvania court, straightforwardly admits in its case-in-chief that it is proceeding arbitrarily and without any evidentiary basis whatsoever, and nevertheless demands that the court enter judgment in its favor on a fictional damage amount. When on the rarest of occasions this precise impropriety does occur, however, the demand must be rejected to preserve the integrity of the courts. Because the Majority refuses to do so, I must dissent.

Chief Justice Saylor and Justice Todd join this dissenting opinion.